**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| [UNDER SEAL], | ) | |
| | ) | |
| Relators, | ) | Case No.: 1:05-CV-3147-JEC |
| | ) | |
| v. | ) | **FILED IN CAMERA AND UNDER** |
| | ) | **SEAL** |
| [UNDER SEAL], | ) | |
| | ) | **SECOND AMENDED** |
| Defendants. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | **UNDER THE FEDERAL FALSE** |
| | ) | **CLAIMS ACT** |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel* JAMES R. BRICKMAN and GREENLIGHT CAPITAL, INC., Relators, v. BUSINESS LOAN EXPRESS LLC, f/k/a BUSINESS LOAN EXPRESS, INC; BUSINESS LOAN CENTER, LLC; f/k/a BUSINESS LOAN CENTER INC.; ALLIED CAPITAL CORP.; MICHAEL COHEN; ROBERT TANNENHAUSER; JENNIFER GOLDSTEIN; LOUIS HAFKIN; MATTHEW McGEE; JOAN SWEENEY, GEORGE HARRIGAN; Does 1-100, Defendants. | § § § § § § § § § § § § § § § § § § § § | CASE NO.: 1:05-CV-3147-JEC  **FILED IN CAMERA AND UNDER SEAL**  **SECOND AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT**  **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Relators file this Second Amended Complaint to recover damages and civil penalties on behalf of the United States of America under the False Claims Act, 31 U.S.C. 3729 et seq., arising out of false claims presented by Defendants under the Small Business Act, Public Law 85-536 (the "Act"), 15 U.S.C. 631 et seq.

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. 1331 and 31 U.S.C. 3729 et seq.

---

2. Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. 1391(b) and (c). Section 3729(a) of the False Claims Act provides that "[a]ny action under section 3730 may be brought in any judicial district in which any Defendant may be found to reside, or transact business, or in any district in which any proscribed act has occurred." Defendant Business Loan Express LLC has an office in and transacts business within the judicial District of the Northern District of Georgia.

3. Under the False Claims Act, this Complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendants until the Court so orders.

## PARTIES TO THE ACTION

4. Qui tam Relator James R. Brickman is and at all times material herein was a citizen of the United States of America residing in Dallas, Texas and brings this action on behalf of the United States of America. Brickman is an individual investor and has developed information about the activities of Defendants that lead Brickman to believe that the Defendants have worked a fraud upon the United States of America.

5. Qui tam Relator Greenlight Capital, Inc. (hereinafter "Greenlight") is and at all times material herein was a corporation doing business in the State of New York, is a resident of the State of New York, and brings this action on behalf of the United

States of America. Greenlight acts as an investment manager for various funds under its management and primarily makes investments in publicly traded U.S. securities. In the course of its business Greenlight has developed information about the activities of Defendants which leads Greenlight to believe that the Defendants have worked a fraud upon the United States of America.

6.    Relators have furnished to the Attorney General of the United States and to the United States Attorney for the Northern District of Georgia, simultaneously with the filing of the original Complaint, a statement of all material evidence and information related to the Complaint and will supplement that statement as additional information is discovered. This disclosure statement as supplemented supports the existence of false claims made and caused to be made by the Defendants.

7.    Defendant Business Loan Express LLC f/k/a Business Loan Express, Inc. ("BLE", and together with all of its subsidiaries, hereinafter "BLX") is and at all times material herein was a limited liability company doing business in the State of Georgia, approving business loans guaranteed by the Small Business Administration (the "SBA"). BLE was created on January 1, 2001 when Allied Capital Corp. (hereinafter "Allied") bought a small business lender, BLC Financial Services, Inc. (hereinafter "BFS") and merged it with its own SBA lending arm – Allied Capital Express (hereinafter "ACE"). Although Allied has claimed that BLE is merely an "investment", it has admitted publicly that BLE is actually a subsidiary of Allied.

According to Securities Exchange Commission (the "SEC") filings, Allied owns nearly 94.9% of BLE. The remaining equity is reportedly held by executives from BFS who now run BLE.

8.     BLE is located at 645 Madison Avenue, New York, New York, 10022. It also has offices in Atlanta, Georgia located at 3675 Cloudland Drive, N.W., Atlanta, Georgia 30327. BLE operates 47 regional offices across the United States, and claims that its $2.4 billion loan portfolio now encompasses over 3,300 small business borrowers.

9.     Defendant Business Loan Center, LLC f/k/a Business Loan Center, Inc. (hereinafter "BLC") is and at all times material herein was a limited liability company with a principal place of business located at 645 Madison Avenue, 19th Floor, New York, New York 10022, was doing business in the State of Georgia, and was submitting business loans for approval to the SBA under the 7(a) loan program to obtain SBA guarantees on such loans. BLC is a wholly owned subsidiary of BLE.

10.     Defendant Allied is and at all times material herein was a corporation doing business in the State of Georgia and owns nearly 94.9% of the equity of BLE. Allied is a publicly held, private equity-investing firm located at 1919 Pennsylvania Avenue, Washington, D.C. 20006.

11.     Relators are informed and believe and based thereon allege that each of the specifically identified individual Defendants, Robert Tannenhauser, Michael

Cohen, Jennifer Goldstein, Louis Hafkin, Matthew McGee, George Harrigan and Joan Sweeney were, at all times material herein, officers, managers, directors, or senior executives of BLX, and as such were either on BLX's loan committee, or in other ways exercised significant influence or control over which applications for SBA loans were approved by BLX.

12.     Each of the Defendants designated as a Doe is an entity the form and identity of which is unknown to Relators at this time, but is involved in submitting or causing the submission of false claims and records by one or more of the named Defendants herein.  Relators will seek leave to amend this Complaint to set forth their true identities once they become known.

13.     At all times herein mentioned, each of the Defendants Robert Tannenhauser, Michael Cohen, Jennifer Goldstein, Louis Hafkin, Matthew McGee, George Harrigan and Joan Sweeney were agents, servants or employees of each of BLE, BLC and/or Allied, and were at all times acting within the purpose or scope of said agency or employment, and were acting with the express or implied knowledge, permission or consent of each of the Defendant entities.

## FACTS COMMON TO ALL CAUSES OF ACTION

### LEGAL AND REGULATORY FRAMEWORK

14.     In the 1950's Congress created the SBA to provide technical and management assistance to qualified small businesses (see 15 U.S.C. 636(a)).  The

SBA offers numerous loan programs to assist small businesses. It is important to note, however, that the SBA is primarily a guarantor of loans made by private banks and other institutions. The SBA enables its lending partners to provide financing to small businesses when funding is otherwise unavailable on reasonable terms by guaranteeing major portions of loans made to such businesses.

15.     The SBA Section 7(a) Loan Guarantee Program authorizes the SBA to lend money to eligible, credit-worthy businesses by having the SBA provide guarantees to participating lenders. The program operates through private-sector lenders that provide loans that are, in turn, guaranteed by the SBA—the SBA has no funds for direct lending or grants under Section 7(a). Section 7(a) loans are the most basic and most frequently used loans within the SBA business loan program. Its name comes from Section 7(a) of the Small Business Act, which authorizes the SBA to provide business loans to small American businesses. All Section 7(a) loans are provided by lenders who are called "participants" because they participate with the SBA in the Section 7(a) program. There are bank and non-bank lenders such as BLX herein, which participate with the SBA in the Section 7(a) program making loans under SBA guidelines. All Section 7(a) loans that the SBA guarantees must meet Section 7(a) underwriting criteria. Under the program, the borrower receives a loan from its lender with a 7(a) structure and the lender gets an SBA guarantee on a significant portion of the loan.

16.     There are three categories of SBA lenders: general program lender (hereinafter "GP"), certified lender (hereinafter "CLP") and preferred lenders (hereinafter "PLP"). PLP lender status allows a lending partner to directly approve SBA loans "in house" on behalf of the SBA. GP lenders must refer loan proposals to the SBA for approval. CLP lenders are lending institutions which have been accredited by the SBA based upon, inter alia, a satisfactory performance history including submission of complete and accurate loan packages, and an acceptable ratio of defaulted loans purchased by the SBA to loans originated by the lender.

17.     Section 7(a) loans are available only on a guarantee basis. BLX's obligations under the 7(a) program to the SBA emanate from (1) the parties' loan guarantee agreement itself (the "Loan Guarantee Agreement"); (2) the loan authorization issued by the SBA and (3) federal regulations and standard operating procedures (the "SOP's") implementing the 7(a) program. The terms of the Loan Guarantee Agreement require BLX to close and disburse all SBA-guaranteed loans in accordance with the terms and conditions of the applicable loan authorization, and to take all actions, consistent with prudent closing practices, necessary to protect the interests of the SBA. The Loan Guarantee Agreement also obligates BLX to follow the loan servicing standards employed by prudent lenders generally, and it incorporates, by reference, the SBA's rules and regulations.

18.     Federal appropriations are available to the SBA to provide guarantees on loans structured under the agency's requirements. With a loan guaranty, the actual funds are provided by independent lenders who receive the full faith and credit backing of the Federal Government on a portion of the loan they make. The SBA does not fully guarantee 7(a) loans. Although the program envisions that the lender and the SBA share the risk that a borrower will not be able to repay the loan in full, BLX instead sells off most of the unguaranteed portions of the loans. Allied has touted how little risk BLX has if the borrower defaults.

19.     The SBA guarantee against payment default does not cover imprudent decisions by the lender or misrepresentations by the borrower. Under the guarantee structure, commercial lenders make and administer the loans. A borrower applies to a lender for financing. The lender decides whether or not to make the loan. If the borrower has some weaknesses as shown in its application, the lender may decide to seek an SBA guarantee of the loan. The guarantee the SBA provides is available only to the lender and the buyer of that lender's loans in the secondary market. This assures the lender that if the borrower does not repay its obligations and a payment default occurs, the SBA will reimburse the lender for part of its loss, up to the percentage of the SBA's guarantee.

20.     The SBA is released from liability on a loan guarantee if the lender has not substantially complied with all of the provisions of the SBA's regulations and the

---

Loan Guarantee Agreement (see 13 C.F.R. §120.202-5). The SBA may refuse to honor the guarantee if the lender has not complied with the SBA servicing and underwriting requirements (see SOPs 50-50 and 50-10). If the loan has been resold in the secondary market, the SBA may seek to recover the reimbursement of the guarantee payment from the originating lender. The purchase by the SBA of the guaranteed portion of a loan does not waive any of SBA's rights to recover money paid on the guarantee, based upon the lender's negligence, misconduct, or violation of this part, including those actions listed in 13 C.F.R. § 120.524(a), the Loan Guarantee Agreement or the Loan Instruments[1]. These guarantee requirements provide a substantial incentive for a lender such as BLX to misrepresent compliance with the origination, servicing and underwriting requirements and to file false certifications requesting guarantees in order to obtain guarantee coverage for non-compliant loans.

21. 13 C.F.R. § 120.524 expressly provides that:

(a) SBA is released from liability on a loan guarantee (in whole or in part, within SBA's exclusive discretion), **if any** of the events below occur:

(1) The Lender has failed to comply materially with any of the provisions of these regulations, the Loan Guarantee Agreement, or the Authorization Agreement;

(2) The Lender has failed to make, close, service, or liquidate a loan in a prudent manner;

---

[1] Authorization, note, instruments of hypothecation, and all other agreements and documents related to a loan as set forth by SOP 50-10(4)(E).

(3)    The Lender's improper action or inaction has placed SBA at risk;

(4)    The Lender has failed to disclose a material fact to SBA regarding a guaranteed loan in a timely manner;

(5)    The Lender has misrepresented a material fact to SBA regarding a guaranteed loan;

(6)    SBA has received a written request from the Lender to terminate the guarantee;

(7)    The Lender has not paid the guarantee fee within the period required under SBA rules and regulations;

(8)    The Lender has failed to request that SBA purchase a guarantee within 120 days after maturity of the loan;

(9)    The Lender has failed to use required SBA forms or exact electronic copies; or

(10)   The Borrower has paid the loan in full.

(b)    If SBA determines, after purchasing its guaranteed portion of a loan, that any of the events set forth in paragraph (a) of this section occurred in connection with that loan, SBA is entitled to recover any money paid on the guarantee plus interest from the Lender responsible for those events.

(c)    If the Lender's loan documentation indicates that one or more of the events in paragraph (a) of this section may have occurred, SBA may undertake such investigation as it deems necessary to determine whether to honor or deny the guarantee, and may withhold a decision on whether to honor the guarantee until the completion of such investigation.

(d)    Any information provided to SBA prior to Lender's request for SBA to honor its guarantee shall not prejudice SBA's right to deny liability for a guarantee if one or more of the events listed in paragraph (a) of this section occur.

(e)    Unless SBA provides written notice to the contrary, the Lender remains responsible for all loan servicing and liquidation actions until SBA honors its guarantee in full.

22.     In the loan application, the borrower must disclose any amounts paid to representatives, including loan brokers, "that helped the applicant obtain the loan, describing the services performed, and disclosing the amount of each fee paid or to be paid by the applicant to the Agent in conjunction with the performance of those services." SOP 50-10(4), Subpart A-Ch. 6-¶12; 13 C.F.R. 120.195; see also SBA Form 159, "Compensation Agreement."

23.     All lenders must service and liquidate all loans that were approved on or after October 1, 1997. For loans approved before October 1, 1997, all lenders are expected to service and liquidate a loan when they have asked the SBA to honor its guaranty (see SOP 50-4A.) Relators are informed and believe that the SBA regulations set rules for servicing and liquidation that are not followed by BLX.

24.     The boat loans in this complaint are referred to as GP loans because BLX submitted the loans to the SBA for approval and was provided a GP identification number for each loan. Boat loans may not be processed as PLP loans. Before a boat loan is eligible for consideration by the SBA, the Department of Commerce's National Marine Fisheries Service (hereinafter "NMFS") must reject the loan (see SOP 50-10-4 subpart A; §15(c)). However no NMFS rejection letters were obtained by BLX for the subject boat loans, ignoring this SOP.[2]

---

[2] "Prior to SBA consideration, SBA must have a decline letter from the NMFS stating: (1) The applicant is ineligible for assistance under NMFS programs;(2) Funds are unavailable for lending under NMFS programs; or (3) The loan has been

25.     As an SBA lender, BLX prepared or assisted in preparing loan packages that were submitted to the local SBA field office for review. An SBA field officer either approved the loan for an SBA guarantee or denied the loan based on information the lender and borrower provided. The SBA's guarantee is expressly subject to the SBA's Written Authorization Agreement (hereinafter "Authorization Agreement"), executed by the SBA and the lender. BLX did not close the shrimp boat GP loans disclosed in this Complaint in accordance with the terms of the SBA's Authorization Agreement. BLX did not comply with its Loan Guarantee Agreement, and BLX did not document that the borrower used the loan proceeds for the purposes stated in the Authorization Agreement. To the contrary BLX aided and abetted borrowers' circumvention of the terms of the Authorization Agreement.

26.     The SBA's guarantee is expressly contingent upon the submission of accurate underwriting information that adheres to SOP 50-10 (4) and regulations.[3] A sample Authorization Agreement that BLX executed with the SBA is attached as Exhibit 1. In this Authorization Agreement and others like it, BLX agreed that, *inter alia*:

> "B. IT IS THE LENDERS SOLE RESPONSIBILITY TO:  Close the Loan in accordance with the terms and conditions of the Authorization."

---

considered and declined by NMFS. The NMFS also evaluates the request to determine if it is a wise use of fishery resources."

[3] CODE OF FEDERAL REGULATIONS TITLE 13--BUSINESS CREDIT AND ASSISTANCE CHAPTER I--SMALL BUSINESS ADMINISTRATION PART 120

---

"C.CONTINGENCIES: SBA issues this Authorization in reliance on representations in the loan application, including supporting documents." The guarantee is contingent upon Lender:

1. Having and complying with a valid SBA Loan Guarantee Agreement". (shown in Exhibit 2).
2. *"Intentionally Omitted"*
3. Having and complying with the current Standard Operating Procedures (SOP)"
4. *"Intentionally Omitted"*
5. *"Intentionally Omitted"*
6. Satisfying all conditions in the Authorization."

"F.   USE OF PROCEEDS:  Lender must document that Borrower used the loan proceeds for the purposes in this Authorization."[4] Lender must complete SBA Form 1050 Settlement Sheet, for each disbursement and retain these forms in its Loan File."

"H.   ADDITIONAL CONSIDERATIONS; Lender must obtain evidence that prior to disbursement.

A.   Cash Injection.  A minimum percentage of cash has been injected into the business as equity capital."

"In consideration of SBA's guarantee of the Loan to be made to Borrower, Lender accepts the above conditions. Business Loan Center Inc."

27.   BLX must also use reasonable care in closing SBA guaranteed loans, and must ensure that the loan funds are disbursed to the correct person and for the authorized purpose. SOP 50-10(4)(E) requires that BLX "act as reasonably prudent

---

[4] The Requirements for Evidence of the Borrower's Contribution. All sources of funds must be listed on the "Use of Proceeds" Form, SBA Form 1429, a closing document. The CDC must retain the supporting documentation. The following are some documents a CDC would retain as evidence of contribution:
  (1) Copies of all loan documents evidencing the source and terms of any loans;
  (2) Copies of paid receipts, canceled checks or other evidence satisfactory to SBA;
  (3) A bank's settlement statement evidencing the purchase of the property; and
  (4) The "pay-out sheets" maintained by the interim lender.

lenders and close SBA guaranteed loans with the same degree of care they use in closing their own independent loans." The Act requires BLX to take such actions consistent with prudent lending practices and to fully protect or preserve the interests of the lender and the SBA. BLX must also comply with The Federal Code of Regulations 13 C.F.R. § 120. Sec. 120.151, which limits the aggregate amount of the SBA portions of all loans to a single borrower.

## FACTUAL ALLEGATIONS

28.     BLX has repeatedly and materially violated its Authorization Agreement with the SBA, BLX's Loan Guarantee Agreement, SBA's SOPs 50-10 and SOP 50-50, and The Federal Code of Regulations 13 C.F.R. § 120. BLX fraudulently violated the Act and failed to act as a prudent lender by closing loans without verifying that the borrowers were making the requisite capital injection and in many instances by having actual or constructive knowledge that the borrower had made no capital injection at all, and in essence provided 100% financing. These acts and omissions release the SBA from liability on the loan guarantees for each non-compliant loan, and permit recovery by the SBA for any payments made to BLX on such loans (see 13 C.F.R. § 120.524).

29.     BLX recognizes its revenue using gain-on-sale accounting and receives its compensation based on the volume of loans originated. Since BLX sells most of the unguaranteed portion of the loans it originates, it is less sensitive to the risks of

those loans and can instead opt to flood the system with as many loans as possible, without regard to their quality. BLX practices also include weak oversight on the approval of loans and weak scrutiny of the loan applications. Loan applications are held up by BLX until the end of the month or quarter, and then are rushed through the loan committee with no time to check facts. This procedure is in keeping with BLX's orientation of getting applications in, out, and funded as quickly as possible.

30.     BLX systematically engages in loan origination fraud, committing the SBA to guarantee loans, which, under SBA's policies and prudent lending practices, should never have been made or guaranteed. BLX ignored prudent lending policy and loan servicing policy to fraudulently enrich BLX, BLX's management and majority owner Allied, at the SBA's expense.

31.     As a result of BLX's fraudulent loan packaging, submittal, and loan servicing, almost all of the 148 GP loans shown in Exhibit 3 have defaulted or are materially impaired.

## DEFENDANTS' METHODS OF COMMITTING LOAN FRAUD

32.     The SBA has purchased about $38 million in guarantees as of October 31, 2005, and this amount may grow to $60 million to honor SBA guarantees on the 148 loans shown which BLX submitted, closed and serviced. Many, if not all of these GP loans, and other GP loans, did not qualify for SBA guarantees.

---

33.     Defendants' fraudulent approach to issuing and processing government-guaranteed loans takes several forms:

- Illegally preparing loan applications for borrowers;

- Failing to independently verify details in loan applications;

- Failing to verify, or inflating the value of collateral;

- Failing to verify borrower's tax returns;

- Failing to verify that the borrower is injecting any, or enough of his own capital into the enterprise;

- Creating sham appraisals, or using appraisals of extremely doubtful validity;

- Refinancing defaulted loans at inflated prices to conceal losses;

- Failing to disclose compensation paid to agents and third parties that helped the applicants obtain loans, including a description of the services performed, and disclosing the amount paid;

- Funding of closings without bona fide transfer of ownership;

- Relying on loan brokers with suspicious ties to regional BLX managers to drive new loan originations. Often these broker-driven loans are of poor credit quality, and seem underwritten merely to pad the pockets of the brokers and allow BLX managers to report high origination volumes;

- Actively concealing actual operational results;

- Employing a convicted felon as a senior manager in BLX's Virginia office despite the fact that the SEC barred him from affiliating with an investment company;

- Fraudulent and reckless servicing of the loans;

- Procuring loan guarantee payments from the SBA by falsely claiming that BLX has originated and serviced its guaranteed loans in a commercially reasonable manner and otherwise has complied with the terms of the parties' agreement and the regulations;

- Refinancing defaulted loans to cover up losses, or arranging the sale of borrowers assets financed with loans to new borrowers in violation of 13 C.F.R. § 120 Sec. 120.201 provides that a Borrower may not use 7(a) loan proceeds to pay any creditor in a position to sustain a loss causing a shift to SBA of all or part of a potential loss from an existing debt;

- Using GP loans to bail out other lenders in violation of 13 C.F.R. § 120.201; and

- Preparing fake SBA loan documentation for which no request for guaranty was ever submitted to nor approved by the SBA.

34. Although the preceding litany focused on loan origination fraud, Defendants' fraud permeated the entire loan administration, servicing and liquidation processes.

35. Relators are also informed and believe and based thereon allege that (a) Defendants illegally concealed loan delinquency information from the SBA, and (b) Defendants had economic ties to loan brokers which gave the brokers confidence that virtually any person or entity would be accepted by BLX as a borrower and that any property would be accepted as collateral, and which gave Defendants a strong financial incentive to turn a blind eye to obviously flawed loan applications.

## BAD SHRIMP BOAT LOANS

36.     In 1997, SBA lending policy disallowed loans on new boats over five tons without submission to the NMFS.  BLX has made 144 boat loans that never included the required submission to the NMFS in order to avoid having NMSF rejection letters in the loan files.  At least 83 of those loans are in default.

37.     BLX shrimp boat loans have defaulted because of BLX's refusal to adhere to SBA requirements for underwriting and administrative procedures set forth in SOP 50-10, SOP 50-50, and 13 C.F.R. § 120.  BLX did not document that the borrower used the loan proceeds for the purpose stated, as required by the Authorization Agreement.   On information and belief, BLX aided and abetted borrowers' circumvention of the terms of the Authorization Agreement.  BLX did not "verify that prior to disbursement that the requisite borrower cash injection was made and BLX, or its agents assisted the borrower in falsifying the verification of the cash injection".

38.     BLX did not comply with its Loan Guarantee Agreement or "service the loans in a prudent manner."  To the contrary BLX delayed recognition of loss using various schemes.  BLX violated: 13 C.F.R. § 120.453 which requires that "the lender must service and liquidate its SBA guaranteed loan portfolio (including its non-PLP loans) using generally accepted commercial banking standards employed by prudent lenders.  The lender must liquidate any defaulted SBA guaranteed loan in its portfolio

unless SBA advises in writing that SBA will liquidate the loan. The lender must submit a liquidation plan to SBA prior to commencing liquidation action." Rather than recognize loss, BLX delayed impairment, allowed new loans to be made on radically impaired collateral and delayed foreclosing on defaulted loans.

39.     Claims made for SBA guarantee reimbursement on the defaulted boat loans will likely exceed $60 million, with an expected loss of over $50 million. BLX's internal records show top management has actively concealed GP shrimp boat loan frauds since 2001. Boat lending fraud was originally identified by Relators from management's internal records and witness interviews. As Relators discovered through an investigation they conducted, "Shrimp boat [loans] was a scam unto itself. Loads of loans to shrimp boaters. Most of all went bad. All loans brokered through this bad guy named George Ng". When a loan would enter work-out (and be reviewed for write-down), Ng would furnish a fake "offer" for a boat (principal collateral) for nearly the loan value. BLX would notate the "offer" into the file to justify keeping the loan at par or only slightly devalued.

40.     On information and belief, since early 2001, BLX's top management knew many or all of the loans set forth in Exhibit 3 were fraudulently closed, overvalued based on sham appraisals and bogus purchase offers, and they actively hid this information from the SBA.

41.     Most if not all of the 148 shrimp boat loans shown in Exhibit 3 were approved in the Richmond Office of BLX. Matthew McGee, a top executive in the Richmond office has a long history of fraud and his family has a 25 year long relationship with Allied and top management of Allied.

42.     Matthew McGee was convicted of securities fraud in June of 1996 in the U.S. District Court for the Eastern District of Virginia. He was sentenced to five months in prison and two years of supervised release. In addition to his criminal conviction, McGee also settled an SEC administrative proceeding against him based on the same criminal conduct. McGee agreed to a consent order that required him "to cease and desist from violating the antifraud provisions" (of the Securities and Exchange Act of 1934, as amended) and bars McGee from association with any broker, dealer, municipal securities dealer, investment adviser or investment company.

43.     Shortly after his release from prison McGee was hired by BLX. At the time of his hiring by BLX, McGee's father, Robert McGee, was a senior executive at BLX and sat on the company's loan approval committee.

44.     McGee has developed a stable of loan brokers across the country that bring potential borrowers to BLX in exchange for fees or commissions for the loans they originate that are issued by BLX. One of the key loan brokers working with Matthew McGee is Kevin J. Friedrich of Dover, Pennsylvania. He is a partner in Credit America Funding Corp. and has generated about $48 million to $60 million

worth of loans per year for Matthew McGee's Richmond, Virginia, BLX office. Friedrich and McGee work closely together and no one else in their operation is permitted to deal with the loan application information. McGee handled the internal approval of all the loans that Friedrich generated and then also handled the SBA loan guaranty filing process. Relators are of the belief that most of the boat loans were either closed or processed through McGee's office in Richmond, Virginia.

45.    Like McGee, Friedrich has a less than pristine background in the financial world. He twice entered into consent agreements with the Pennsylvania Securities Commission because of fraudulent dealings with individual investors. In late 1990, he was banned for five years from working in the investment business.

46.    BLX's private August 2001 loan delinquency report (hereinafter the "Delinquency Report") shows GP loans defaulted before the summer of 2001, and that BLX was violating the 13 C.F.R. § 120.151 statutory limit for total loans to one Borrower, including the Borrower's affiliates as defined in 13 C.F.R. § 121.103. BLX was also violating SBA loan servicing policy by not accurately reporting loan status and defaults. Each month, BLX is required to report to the Fiscal and Transfer Agent ("FTA") using SBA Form 1502[5], "Guaranty Loan Status & Lender Remittance Form," on the status of all their SBA guaranteed loans, showing loan collections and other information specified in reporting instructions for this program (see SOP 50-50 4A).

---

[5] The FTA serves a clearinghouse function, receiving payments from lenders and sending them to investors.

## NGA NGUYEN BOAT LOANS

47.    The Delinquency Report shows Si Thanh Tran and "Viet Fleet-Nga Nguyg" were "primary borrower(s)" for a $640,000 boat known as Lady Kristie. This loan went into default within just months after origination. To keep the loan from being reported as delinquent to the rating agencies, BLX executive George Harrigan wired a $3,444 payment on July 30, 2001 on behalf of the borrower, in violation of SBA lending policy (see below).

---

1-0-092900H    SI THANH TRAN dba LADY KRISTIE
Short Name: LADY KRISTIE  Risk Factor-0
Notes:
Primary Borrower: SI THANH TRAN

Viet Fleet-Nga Nguyg (228)374-3805                                    Bus Phone: (409)734-8424 Ext:
Serv. Officer        SK-SK

| | | | | |
|---|---|---|---|---|
| Note Amt. | 640,000.00 | | Current Balance | 626,372.22 |
| Current Payment | 6,786.00 | | Next Due For | 08/01/2001 |
| Interest Paid to | 08/06/2001 | | Current Accrued | 2,445.43 |
| Last Payment Date | 08/06/2001 | | Last Payment Amt. | 3,444.00 |
| | | | Prin + Acc= | 628,817.65 |
| Monthly Payment | 6,786.00 | | | |

Total of Payments                    6,786.00
Subtract                            -4,514.55    For Partial Payment(s)
Include An Additional                 2,271.45    Unpaid Late Charge(s)
   7/30 o1 Borrower wired $10,684 George Harrigan to wire $3444 on Friday 8/3.(SK)

   7/25/01 CG - Left message to George Harrigan regarding 7/1/01 payment.

   6/27/01 George wired funds today for the June payment. He has requested a letter from BLC to give to the
   borrower. (SK)

   6/26/01 George Harrigan called SK to say that he was working on the $10,536 that is due. He will call me
   back today

   6/21/01 George Harrigan called SK to say the borrower will be in this weekend and we will get the
   payment early next week.

   6/13/01 SK left a message for George Harrigan regarding balance of May & June payments due.
    George called back to say vessel would be in this weekend and we should have a payment by 5/19.

---

48.     Tuc Van Vo obtained a $425,000 SBA loan from BLX for a boat named Miss Thom II. This loan defaulted before August 2001 and top BLX executive George Harrigan was again involved in a "workout." Nga Nguyen was also involved as director/executive of Miss Thom II Inc. To avoid reporting that the loan was in default, BLX thereafter convinced the SBA to grant a "retroactive deferment" for unpaid accrued interest owed for the prior three months. The deferment only postponed default. Mr. Vo later filed for bankruptcy protection and was discharged.

1-1-071400   Tuc Van Vo dba Miss Thom II
   Short Name: Miss Thom II   Risk Factor-0
   Notes:
   Primary Borrower: Tuc Van Vo

Bus Phone: (504)563-4153 Ext:

Note Amt.          425,000.00
Current Payment    4,616.00
Interest Paid to   05/07/2001
Last Payment Date  06/29/2001

Monthly Payment    4,616.00

Current Balance    422,403.14
Next Due For       08/01/2001
Current Accrued    12,437.75
Last Payment Amt.  5,385.00
Prin + Acc=        434,840.89

Total of Payments        4,616.00
Include An Additional    1,036.00   Unpaid Late Charge(s)
   NEXT DUE DATE (ADJUSTMENT) : pursuant to a 90-day retroactive deferment intended for Apr/May/Jun
   2001, the following adjustments were made :
   - Next Due Date : corrected to be July 2001
   - Late Fees : assessed on 04/11, 05/11, 06/11 were waived.

   6/14 - LSO (SM) received SBA's concurrence regarding 90-day deferment today.

   4/27/01 SK We received $8000 today. .$2650 will be applied for the balance of the 3/1 payment that is
   due. The balance will be placed in the equity account to be used as the post deferment payment for July
   1.

   4/27/01 SK  spoke with George Harrigan.  Payment for $8000  went out overnight today.

   4/25 - LSO (SM) spoke with Mr. Tuc Van Vo today and informed him that in order for BLX to grant a
   possible deferment for April, May & June updated business and personal financial statements are needed.
   Also, Sandi Kalish spoke with George Harrigan and he will intervene on BLX's behalf to explain the
   situation to borrower.  George Harrigan will assist BLX in contacting the insurance company for insurance
   claim for approximately $8,000.  Mr. Harrigan will contact Sandi on Friday.

   04/24/01 (DD) Reinstatement Notice has been received under Po# SP2340-479-00/01, Po#OM0487, and
   Po#EPG-01-04094.

The collateral is worth a fraction of the amount owed.

49.     In August 2000, BLX closed a $720,000 SBA loan for a boat known as

Anthony Boy III.  The Delinquency Report shows that less than a year later this loan

was also in default.  The address for Anthony Boy III was 358 Pine, Biloxi MS.  This

address in Biloxi is Nga Nguyen's residential address.  This is yet another defaulted

Nguyen related-party loan that exceeded maximum loan limits.

1-0-082300    THAM T. TRUONG and TAI T. MAI dba ANTHONY BOYIII
   Short Name: ANTHONY BOY III  Risk Factor-0
   Notes:
   Primary Borrower: THAM T. TRUONG

       GHarrigan (570)643-9811                                    Bus Phone: (337)893-1929 Ext:
   Serv. Officer     CG-CG

   Note Amt.          720,000.00          Current Balance      705,135.29
   Current Payment      7,551.00          Next Due For         08/01/2001
   Interest Paid to    08/16/2001          Current Accrued         917.65
   Last Payment Date   08/16/2001          Last Payment Amt.    15,737.00
                                           Prin + Acc=          706,052.94
   Monthly Payment      7,551.00

   Total of Payments                    7,551.00
   Include An Additional                  818.60   Unpaid Late Charge(s)
       8/7/01 George Harrigan says the borrower will send 2 payments by next week. (SK)

       7/30/01 George Harrigan  spoke with borrower. $8186 will be wired this week.(SK)

       7/25/01 CG - Left message for George Harrigan ( 570-643-9811) regarding 7/1/01 payment.

       6/27/01 We received a certified payment from this borrower yesterday but we had already deposited the
       post dated check we were holding for 6/20.  The check did not clear and Sterling redeposited it.  We dont't
       expect the 2nd deposit to clear however the borrower will have 2 charges to their account for insufficient
       funds.

       6/25/01 George called to say certified funds went out overnight mail today.

       6/22/01 SK left message for George Harrigan to see of we can deposit check.


      50.    Despite knowing that Nga Nguyen, also doing business as "Viet Fleet" or

related parties defaulted on at least three SBA loans in the summer of 2001, BLX

accelerated lending to Nguyen, aliases or related parties to Nguyen or "Viet Fleet", in

the fall and winter of 2001.

      51.    By the end of 2001 the shrimp market was in a well known and obvious

state of collapse due to falling prices from imported shrimp "grown on shrimp farms,

and escalating operating costs caused by rising diesel fuel costs and insurance prices."

The National Marine Fishery Service, which is charged with analysis and National

Policy for U.S. Fishery Resources, reported, "On average vessels were not even able to cover their variable costs in 2002."[6]

52.    Yet in 2002, BLX's shrimp boat lending business grew approximately 43% from the prior year and the average loan size increased by 25%.[7] All or most of BLX's 2002 loans defaulted, many within months of funding.

| Year | # of Loans | Gross $ Loans | SBA Approved | Avg. Loan Size | Growth |
|------|-----------|--------------|--------------|----------------|--------|
| 1999 | 5 | $ 3,700,000 | $ 2,775,000 | $ 740,000 | |
| 2000 | 32 | $ 19,514,000 | $ 13,721,590 | $ 609,813 | |
| 2001 | 52 | $ 32,306,500 | $ 24,087,875 | $ 621,279 | 66% |
| 2002 | 59 | $ 46,168,000 | $ 34,160,410 | $ 782,508 | 43% |
| Total | 148 | $ 101,688,500 | $ 74,744,875 | $ 687,084 | |

53.    BLX made at least 45 loans to Nga Nguyen, the "Viet Fleet", or other entities[8] that resided at 358 Pine Avenue, Biloxi, MS (see Exhibit 4). On information and belief, most if not all of these loans defaulted or are materially impaired. Members of the Nguyen and Hunyh families also profited by making fees from brokering dozens of defaulted SBA loans for BLX.

54.    BLX violated the SBA limitation of a maximum of $750,000 in loans to a single borrower. Despite this limitation, in 2002, BLX closed at least 45 loans worth

---

[6] Update on the Economic Status of the Gulf of Mexico Commercial Shrimp Industry, page 6 Michael Travis Phd. National Marine Fisheries Service, St. Petersburg, Florida

[7] This is calculated based on the loans shown in Exhibit 3 - other boat loans may exist.

[8] The calculation of a firm's size includes the employees or receipts of all affiliates. Affiliation with another business concern is based on the power to control, whether exercised or not. Such factors as common ownership, common management and identity of interest (often found in members of the same family), among others, are indicators of affiliation. Power to control exists when a party or parties have 50 percent or more ownership. It may also exist with considerably less than 50 percent ownership by contractual arrangement or when one or more parties own a large share compared to other parties. *SBA Glossary of terms about Small Business Size Standards*

over $20 million to parties at the same address (often using the same phone number). Numerous loans were made to the "Viet Fleet." The "Viet Fleet" was apparently a boat leasing/revenue sharing operation. Viet Fleet Leasing, Inc. also has offices at 358 Pine Avenue, Biloxi, MS and is run by Nga Nguyen.

## THOMAS NGUYEN LOANS FOR SEA COMMANDERS I THROUGH V

55.     Paragraphs 56 to 73 show how BLX (a) made numerous SBA loans to Thomas Nguyen in violation of SBA loan limits and SOPs, (b) inflated the value of collateral supporting such loans, and (c) continued making loans after Thomas Nguyen defaulted on other SBA loans. The SBA stands to lose over $1.1 million on these loans alone.

56.     In 1999, Thomas Nguyen received a $625,000 SBA guaranteed loan (hereinafter "Nguyen Loan No. 1") to buy a new shrimp boat known as Sea Commander I. The bank that made the loan, Boca Raton First National Bank, failed. Nguyen's loan was purchased and assigned from the SBA to Beal Bank. Nguyen surrendered the Sea Commander I to Beal Bank in 2004. An SBA guarantee reimbursement for $625,000 (100% of the loan), higher than the allowed 75% maximum under SBA guidelines, has already been paid. This reimbursement of 100% of the loan amount does not qualify under SBA regulations.

57.    By early 2002, Thomas Nguyen was apparently in default or anticipated being in default on the 1999 $625,000 Nguyen Loan No. 1 on Sea Commander I because the loan was restructured in September 2002.

58.    On May 16, 2000, Khanh Nguyen received approval for a $495,000 BLX SBA loan (hereinafter "Nguyen Loan No. 2") to purchase Sea Commander II as part of the Viet Fleet using the same address as Thomas Nguyen.

59.    In March 2002, Thomas Nguyen sold Sea Commander II to Thanh Van Tran. Tran's purchase was funded by a $640,000 BLX SBA loan (GP 426 498 4009-LA). –Nguyen Loan No. 2, secured by the same collateral two years earlier, was only $495,000, even though the shrimp industry was in decline and the collateral was older. It is not clear how BLX could possibly have thought the collateral was worth $145,000 more in March 2002 than it was in May 2000. The sale allowed Nguyen to pocket cash. The boat was renamed Princess Diana. Tran's loan also went into early default. BLX foreclosed the loan, and was the high bidder when the boat was sold at public auction in May 2005 for $4,100, or less than 1% of the original loan value.

60.    On August 28, 2001, Thomas Nguyen borrowed $600,000 from Caterpillar Finance to purchase Sea Commander III. This non-SBA loan also defaulted. Caterpillar's $600,000 loan received the typical down payment required by most lenders in 2000 of about 25%.

---

61.     In May and July 2002, BLX closed two new SBA guaranteed loans for Thomas Nguyen to buy two new boats also known as Sea Commander IV ($800,000 SBA note shown in Exhibit 5) (hereinafter "Nguyen Loan No. 3") and Sea Commander V ($960,000 SBA note shown in Exhibit 6) (hereinafter "Nguyen Loan No. 4") for a total amount of $1,760,000. These two Nguyen SBA loans exceeded the SBA's loans to one borrower limits (C.F.R. § 120.151) and SBA regulations and SOP. In 2002 the maximum SBA loan(s) allowed to one borrower and affiliates was $1 million and the maximum SBA guaranty was 75% or $750,000. BLX as the SBA's underwriter was charged with verifying financial information and knew or should have known Nguyen had at least $2,473,277 in SBA loans, or about 250% of the permitted amount of SBA loans.

62.     Relators' investigation revealed that BLX's Nguyen Loan No. 3 for $800,000 provided 95% of the money to buy the Sea Commander IV. Nguyen Loan No. 4 for $960,000 to buy Sea Commander V also provided 100% financing. Both of these loans violated the Small Business Act, C.F.R. § 120 and prudent lending practices as required by SOP 50-10.

63.     Both Nguyen loans for Sea Commander IV and Sea Commander V Nguyen went into early monetary default. Den Nguyen and Thomas Nguyen are co-debtors (Exhibit 7). Remarkably, in 2003 BLX made Den Nguyen and Thomas Nguyen additional SBA loans of $38,000 and $50,277 respectively. Presumably, these

two 2003 SBA loans allowed the Nguyens to pay BLX past due interest, inflated BLX's earnings, inflated BLX's value to parent Allied, and allowed BLX to misrepresent losses to rating agencies and the SBA. In late 2002 or 2003 it appears BLX sold Nguyen's unqualified SBA loans in securitization pools to investors as qualified SBA loans.

64. In September 2004, unable to service his BLX loans without funding from another series of BLX unqualified SBA loans, Thomas Nguyen filed for personal bankruptcy.

65. In April and May 2005, BLX foreclosed on both BLX boat loans, Nguyen Loan No. 3 and Nguyen Loan No. 4, paying a total of $76,000 for the boats (see Exhibit 8). BLX's foreclosure bids valued BLX's collateral at about 4 cents on the dollar based on the total amount of BLX's SBA loans and foreclosure costs.

66. BLX's Nguyen Loan No. 3 did not qualify for an SBA guaranty because:

- Nguyen apparently used a derivative of his name to make it appear that his $800,000 May 23, 2002 SBA loan was not related to his $625,000 SBA loan. Like dozens of other fraudulent BLX SBA loans, it is believed the BLX sold the $800,000 loan to investors as a fully insured SBA loan despite the fact that such loan did not qualify for an SBA guarantee.

- Loan authorization requirements and SBA SOP's were totally ignored by BLX as shown below.

- A simple credit check using Nguyen's social security number or audit of financial statements provided in Nguyen's SBA Loan Application should have shown that a $625,000 SBA loan existed and the $800,000 SBA loan should not be made and or would not qualify for full guarantee. In addition the credit check would have shown Nguyen had poor or declining credit.

- The NMFS disallowed lending on new boats and this directive not to lend was codified in SBA lending SOP 50-10(4) that stated "The NMFS has advised SBA that, because of over-fishing, it is no longer financing the construction of new fishing vessels for new ventures and it is reluctant to finance a new fishing vessel for an existing business. It has taken the position that economic prospects are not favorable for new vessels trying to get into commercial fishing unless the species of fish to be harvested is currently under utilized." No objection letter was submitted by BLX or sent by the NMFS on any Nguyen loan. On information and belief the only letter we are ware of from the NMFS to BLX (on another loan) specifically said not to make boat loans.

- Nguyen paid an average of $800,000 for his new shrimp boats and the SBA loan funded 100% of the purchase price of Sea Commander IV. It is believed the SBA Loan Authorization required at least a $150,000 equity injection. BLX was to verify equity injection. False equity injections and inflated loan to value ratios are a repetitive lending violation at BLX on numerous other GP boat loans.

67. Nguyen Loan No. 4 did not qualify for an SBA guaranty because:

- The maximum SBA guarantee in 2002 was 75% of $1.0 million dollars or $750,000. At July 31, 2004, Nguyen had total SBA loans of $1,425,000 and being a co-debtor on this loan pushed Nguyen's total SBA loans to $2,385,000. Like dozens of other fraudulent SBA loans, it is believed this $960,000 loan was sold by BLX to investors as a fully insured SBA loan despite the fact that such loan did not qualify for an SBA guarantee.

- The July 31, 2002 loan was "GP" approved by the SBA. Again, "GP" underwriting required BLX to follow SBA Loan Authorization Letter[9] and SBA lending policy set forth in SOPs. Loan authorization requirements and SBA SOP's were ignored by BLX as shown below.

---

[9] *Authorization* is SBA's written agreement providing the terms and conditions under which SBA will make or guarantee business loans.

---

- A simple credit check using Nguyen's social security number or audit of financial statements provided in Den or Thomas Nguyen's SBA loan application would have shown that a $625,000 SBA loan existed, an $800,000 SBA loan existed and the $960,000 loan guaranteed by the SBA should not be made. Since BLX originated Nguyen's May 23, 2002 $800,000 SBA loan, BLX was either grossly negligent in making another loan or knowingly involved in the fraud.

- The $960,000 loan financed the purchase of a new shrimp boat. As previously noted, the NMFS disallowed lending on new boats and this was codified in SOP.

68. Even before Hurricane Katrina the shrimp industry was already on the brink of extinction. Months before Hurricane Katrina, Nguyen's only boat he still operated (purchased with Caterpillar's smaller loan) was worth $250,000. Before Hurricane Katrina, Caterpillar Finance was marketing boats of the similar age and size as the BLX/Nguyen boats for less than $300,000. Older, pre-1996 shrimp boats are being marketed for less than $50,000 with no offers. Sea Commander IV was recently appraised for $280,000, or 35% of the original $800,000 BLX loan, Nguyen Loan No. 3. Based on the forgoing, absent voiding its guarantee, losses to the SBA on Nguyen's two defaulted BLX loans, Nguyen Loan No. 3 and Nguyen Loan No. 4, will likely exceed $1.1 million.

69.    The federal regulations release the SBA from liability on a loan guarantee unless BLX has substantially complied with all of the provisions of the SBA's regulations and the Loan Guarantee Agreement (see 13 C.F.R. § 120.202-5).

70.    The SBA's 7A Lender Guideline page 71 states that the "Lender should calculate the net realizable value of collateral by applying the following liquidation percentages to the fair market value." The Lender should justify any alternative liquidation values used:

Real Property:

      Commercial – RE ...................... 75%
      Residential – RE ....................... 80%
      Unimproved Land...................... 50%

Business Assets (net of depreciation):

      Machinery/Equipment .............. 50%
      Furniture/Fixtures ..................... 10%
      Leasehold Improvements.......... 5%

71.    Nguyen's boats should have been valued at 50% of appraisal, which implies a value of less than $150,000 before considering the consequences of the recent hurricanes and their impact on the industry. Rather than value the foreclosed collateral pursuant to policy, BLX manipulates the values to defer losses and does all it can to keep values as high as possible, by over valuing the collateral and rolling the loans.

72.     Nguyen's loans are a fraction of BLX's SBA boat lending violations. BLX has made at least 83 boat loans that have defaulted, many with the same underwriting patterns as Nguyen's loans.

73.     Pursuant to the requirements of SOP 50-10(4) and 13 C.F.R. § 120.202-5 BLX must follow the terms set forth in its Loan Guaranty Agreement with the SBA (Form 750). This agreement allows the SBA to terminate its guaranty because:

- BLX did not make a loan "pursuant to requirements of The Small Business Act",

- BLX did not "take such actions as shall be consistent with prudent closing practice, be required to fully protect or preserve the interests of the lender and SBA",

- The SBA "Shall not be obligated to purchase the guaranteed interest of the outstanding balance of the Loan if the SBA determines that the Lenders failed to provide timely and accurate status information". Obviously, BLX did not inform the SBA of BLX's violation of the loans to one borrower limit, grossly negligent underwriting, and loan servicing/liquidation,

- BLX did not follow "acceptable standards of loan servicing". Even after BLX's lawyers discovered that BLX had provided 100% financing in Nguyen's November 2004 deposition, and knew or should have known the loans to one borrower limit was violated, on information and belief, no referral to the OIG was made as required,

- Any request for reimbursement was fraudulent. By making the demand for the SBA to purchase the guaranty "Lender shall be deemed to hereby certify the loan has been disbursed and serviced in compliance with this agreement."

## NGUYEN LOAN ON GULFSTREAM II

74.     The timeline below shows how BLX used the SBA to bail out another loan owed by a Nguyen borrower that resided at 358 Pine, Biloxi, MS. In this loan, BLX closed/refinanced Khau Van Nguyen's bank loan with a 25% larger SBA loan, netting the borrower money, despite the fact that the shrimp industry was in total collapse and Nguyen and/or related parties had numerous other shrimp boat loans in default. This SBA loan went into default shortly after closing.

75.     On October 13, 1997, Khau Van Nguyen sold a vessel named Capt. Jack, with Coast Guard ID 1045090, to Jack and Brad Hemmingway secured by a $372,000 note.

76.     On March 10, 2000, Jack and Brad Hemmingway sold Capt. Jack to Gi Minh Phan. The vessel's name was changed to Gulfstream II. Community Bank and Trust provided $450,000 of financing recorded in book 00-30 page 431 of the National Vessel Documentation Center ("NVDC").

77.     On May 5, 2001, Gi Minh Phan sold Gulfstream II to Xuong K. Nguyen. Nguyen funded the purchase with a $410,726 loan from Community Bank and Trust. On January 16, 2002 Nguyen refinanced the vessel with a $380,000 mortgage from Texas Gulf Bank.

78.     On December 30, 2002, BLX originated and the SBA approved a $475,000 SBA loan to Gulfstream II – $95,000 more than Nguyen owed Texas Gulf

Bank. On January 10, 2003, Nguyen sold the vessel to Asian Gulfstream Corporation (hereinafter "Asian Corp") funded with a $475,000 SBA loan GP 598 097 4001. Asian Corp is owned and/or controlled by Xuong Nguyen with an address at 358 Pine, Biloxi, MS. On information and belief, it appears that Asian Corp was a shell entity to create the appearance of an arms-length sale.

79.    On April 1, 2004, Asian Corp owed $483,100 to BLX. On June 17, 2004, BLX purchased Gulfstream II with a $1,000 credit bid. Losses may be up to 90% of the original loan.

### MASTER CHASE ENTERPRISES

80.    A loan made by BLX to Master Chase Enterprises, Inc. also flaunted the SBA's Authorization Agreement and SBA lending policy. SOP 50-10(4)c discouraged SBA boat lending.

81.    In April 2001, BLX's Richmond Office made a $480,000 SBA loan secured by a first lien on vessels 612075 and 699520 known as GP 4437444010 JVL.

82.    The borrowers were Master Chase Enterprises, Inc. and Iron Eagle Enterprises Inc., guaranteed by William and Sharon Denton. BLX's $480,000 loan paid off existing liens of $63,921 (vessel 699520) and $185,000 (vessel 612075).

83.    Vessel 612075 was a shrimp boat built in 1979 that had previously been sold in foreclosure in 1982 for $100,000. Vessel 699520 was originally purchased with a $93,399 loan in 1986. It is not credible, nor compliant with SBA SOPs that

two 15-20 year old depreciating shrimp boats that previously sold for a fraction of the SBA loan amount years earlier were worth $600,000 in 2001.

84.    The seller of both boats was an experienced shrimp boater and an officer of the Florida Shrimper Association.  The buyers appear to have little or no prior shrimping experience and lived in Tennessee.  Mr. and Mrs. Denton were in the chemicals business and ran a small chemical company known as Chemical Fluidation Service LLP.  Chemical Fluidation Service LLP's charter was revoked for "tax forfeiture" on March 23, 2001, a month before BLX made the loan.

85.    BLX's loan went into default almost immediately.  In April 2002, BLX made a $40,000 second lien PLP loan including $35,000 for "working capital."  On information and belief the "working capital " paid past accrued interest owed to BLX, cured past loan default, delayed impairment, and allowed BLX to mislead rating agencies and the SBA about delinquency of the loan.  Making a PLP boat loan is specifically prohibited.  Making a junior PLP SBA guaranteed loan on impaired collateral is grossly negligent, reckless and fraudulent.  These loans were known by top BLX management because on July 19, 2002, David Redlener, a BLX executive in New York, sent a demand letter stating $11,004 of past interest was due and owing and demanded payment in full.

86. On information and belief, in 2002, the SBA purchased its guarantee on both SBA loans.[10] On April 14, 2003 BLX filed a lawsuit against the borrowers and guarantors. David Redlener notarized the complaint. On June 12, 2003, guarantors William and Sharon Denton filed Chapter 7.

87. On September 17, 2003, William and Sharon Denton were discharged from bankruptcy. On December 10, 2003, BLX repossessed both vessels, paying at public auction $25,000 for vessel 699520 and $15,000 for vessel 612075, a total of $40,000.

88. In January 2004, both vessels were sold to Trawler Little Joe, Inc. for a combined price of $60,000, netting BLX about 10% of the original loan, legal expenses, and dock fees. As of July 2005, the SBA had not charged off any part of the 2001 $480,000 loan despite the fact the collateral was fully liquidated and the guarantors had been discharged from bankruptcy. Interestingly the SBA did charge off its $40,000 loan.

### FALSE SBA LOAN DOCUMENTATION

89. BLX created, drafted and prepared loan documentation on SBA forms purporting that "the loan secured by this lien was made under a United States Small

---

[10] 13 C.F.R. § 120.520. (a) provides that the SBA, in its sole discretion, may purchase a guaranteed portion of a loan at any time. A Lender may demand in writing that SBA honor its guarantee if the Borrower is in default on any installment for more than 60 calendar days (or less if SBA agrees) and the default has not been cured. If a Borrower cures a default before a Lender requests purchase by SBA, the Lender's right to request purchase on that default lapses. (b) Purchase by SBA of the guaranteed portion does not waive any of SBA's rights to recover money paid on the guarantee, based upon the Lender's negligence, misconduct, or violation of this part, including those actions.

Business Administration (SBA) nationwide program...." The fake SBA loans included Mary Trinh's $700,000 mortgage, attached as Exhibit 9, Nga Ho's $450,000 mortgage, attached as Exhibit 10, and Hoa Minh Nguyen's $750,000 mortgage attached as Exhibit 11. BLX's loan documents show these loans are drafted as SBA loans on SBA letterhead and boilerplate. The SBA loan number required on these loan documents is conspicuously absent. The SBA says it never approved two of these false SBA loans (see Exhibit 12).

90.    As reported by C. Shawn McKeehan Special Assistant to the FOIA/PA Officer "The SBA Office of Financial Assistance can locate no records that indicate that we received nor approved a request for guaranty of a loan to the above from Business Loan Center."

### THE ALTER EGO LIABILITY
### OF ALLIED FOR THE ACTS OF BLX

91.    Relators allege that at all times material herein Allied has controlled and operated BLX as the alter ego of Allied, for the benefit of Allied. In so doing it has disregarded the existence of BLX as a separate and distinct corporate entity. Moreover, Allied has done all of this with the intention to defraud the United States and other creditors.

92.    One of Allied's very reasons for purchasing the BLX predecessor, BFS, in the first place, was to gain control of an entity which it could burden with the liability for the bad small business loans previously made by Allied through ACE. By

purchasing BFS's assets and unloading onto it Allied's own liabilities, Allied thus began a campaign of shifting debts and contingent liabilities from Allied to BLX.

93.    Allied's characterization of BLX as an "investment," and Allied's manipulation of the assets and liabilities of BLX for its own benefit at the expense of BLX is further evidence of Allied's operation of BLX as a mere alter ego of Allied.

94.    Allied has seen to it that the key members of its Board of Directors also sit on BLX's Board, thus controlling BLX and ensuring that BLX's operations run solely for Allied's benefit.  The saddling of BLX with liability for Allied's bad loans is one of the products of the failure to maintain an arm's length relationship between the two entities.

95.    Allowing Allied to maintain the fiction that BLX is a separate and independent entity, and not Allied's alter ego, would frustrate the purposes of the False Claims Act as well as the legislative purposes behind the restitutionary provisions of the SBA 7(a) loan program.  Allowing Allied to profit from BLX's submission of false and fraudulent claims and then to evade liability for this despite such profit, would cause a deep injustice to be visited upon the United States.

### FIRST CAUSE OF ACTION FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. 3729

96.    Relators repeat and replead and hereby incorporate each and every one of the allegations set forth in paragraphs 1-95, inclusive, as though fully set forth herein.

97.     In agreeing to participate in the SBA programs, the Defendants were responsible for ensuring that loans they originated, serviced and liquidated complied with SBA's rules and regulations.  Defendants entered into an agreement with the SBA to submit loans in accordance with SBA's rules and regulations, to engage in prudent closing practices and to fully protect the interests of the lender and the SBA. Defendants' conduct, as described herein above, indicates that they did not originate, service or liquidate the loans according to SBA's rules and regulations.  They did not close the loans in a prudent manner or fully protect the interests of the SBA.  They did not make accurate quarterly reports as required, nor did they liquidate defaulted SBA-guaranteed loans in their portfolio according to commercial banking standards employed by prudent lenders, also as required.

98.     Defendants were responsible for ensuring that the loans issued were to be used for an eligible purpose.  Defendants' conduct, as described herein above, indicates that they did not ensure as such since the borrowers defaulted early on the loans, sometimes after making only one or a few payments.  Defendants failed to comply with their obligation to ensure that compensation agreements, such as those for loan brokers, were attached to the lender certification submitted to SBA, or disclose compensation agreements, as required by 13 C.F.R. Part 120 § 120.195.

99.     Defendants were responsible for determining a borrower's eligibility for SBA-guaranteed loans and creditworthiness.  Defendants' conduct, as described

herein above, indicates that they did not make such determinations since the borrowers defaulted early on the loans, sometimes after making only one or a few payments. Defendants failed to accurately and adequately analyze borrowers' capitalization, repayment ability, and collateral, among other things.

100. Defendants circumvented loan caps and limitations on multiple loans to borrowers by ignoring the obvious evidence that borrowers were closely tied and in some cases were one and the same.

101. As detailed hereinabove, Defendants' violations of the SBA's policies and procedures show that they acted in reckless disregard of the loan applications they submitted to the SBA for the SBA's approval through the GP program for an SBA guarantee.

102. As detailed hereinabove, Defendants' violations of the SBA's policies and procedures show that they knowingly and willfully did not ascertain the truth or falsity of the loan applications they submitted to the SBA.

103. The claims submitted by Defendants for the SBA's guarantee were improper, and hence the money to be paid for the guarantees on those loans Defendants made would thus constitute false claims actionable under the False Claims Act. 31 U.S.C. 3729.

104. Specifically, Defendants knowingly presented or caused the presentation of false claims to the United States or an officer of the United States for payment and approval.

105. The United States was damaged as a result of the conduct described above.

**SECOND CAUSE OF ACTION FOR VIOLATION OF**
**THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. 3729**

106. Relators repeat and replead and hereby incorporate each and every one of the allegations set forth in paragraphs 1-95, inclusive, as though fully set forth herein.

107. Defendants were legally required to make periodic reports to the SBA that correctly reflected current and accurate information about the status of loan delinquencies.

108. Relators are informed and believe and based thereon allege that the Defendants filed false reports with the SBA concealing the actual status of delinquent loans.

109. These misrepresentations were material in that they had a natural tendency to influence the SBA to keep Defendants as an SBA approved lender.

110. In doing the things herein alleged, defendant violated 31 U.S.C. 3730 (5).

111. The United States was damaged as a result of the conduct described above.

## THIRD CAUSE OF ACTION FOR CONSPIRACY TO VIOLATE THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. 3729(A)(3)

112. Relators repeat and replead and hereby incorporate each and every one of the allegations set forth in paragraphs 1-95 inclusive, as though fully set forth herein.

113. Relators are informed and believe and based thereon allege that the Defendants and other as yet unnamed individuals acted in concert with one another to obligate the SBA to guarantee loans which did not meet SBA criteria by, *inter alia*, using lenders, bankers, brokers, middlemen, title and escrow agents and others, to circumvent SBA requirements regarding capital injections, to fund business transactions at inflated prices, to use fraudulent financial information, to conceal compensation and related party transactions, and to make other false representations.

114. The United States was damaged as a result of the conduct described above.

## DEMAND FOR JURY TRIAL

Relators request a jury trial.

## PRAYER FOR RELIEF

**For each and every cause of action**:

1. Judgment against the Defendants in an amount equal to three times the damages sustained by the United States as a result of Defendants' conduct;

---

2. A civil penalty of not less than five thousand five hundred dollars ($5,500.00) and not more than eleven thousand dollars ($11,000.00) for each violation of 31 U.S.C. 3729;

3. That Relators, as Qui Tam plaintiffs, be awarded the maximum amount allowed pursuant to 31 U.S.C. 3730(d) and/or any other applicable provision of law;

4. Attorney's fees and costs according to proof.

Respectfully Submitted,

LAW OFFICE OF MARK ALLEN KLEIMAN

Dated: October 11, 2006

By: _____
Mark Allen Kleiman
Calif. Bar No. 115919
1640 Fifth Street  Suite 214
Santa Monica, CA 90401
Phone:  (310) 260-2303
Fax:  (310) 260-2535

Attorney for Relators


HILL & BEASLEY, LLP

By: _____
Janet E. Hill
Georgia Bar #354230
1160 S. Milledge Ave., Suite 140
Athens, GA 30605
Phone:  (706) 353-7272
Fax:  (706) 549-8446

Local Counsel for Relators

## COMPLIANCE WITH LOCAL RULE 5.1

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

Dated: October 11, 2006        LAW OFFICES OF MARK ALLEN KLEIMAN

By: _____
    Mark Allen Kleiman
    California Bar No. 115919
    1640 Fifth Street, Suite 214
    Santa Monica, CA 90401
    Phone: (310) 260-2303
    Fax:    (310) 260-2535