IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CHAMBERS
U.S.D.C. Atlanta

DEC 18 2007

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

UNITED STATES OF AMERICA, *ex
rel.* JAMES BRICKMAN and
GREENLIGHT CAPITAL, INC.,

     Relators,

v.

BUSINESS LOAN EXPRESS, LLC,
f/k/a BUSINESS LOAN EXPRESS,
INC., BUSINESS LOAN CENTER,
LLC, f/k/a BUSINESS LOAN
CENTER, INC., ROBERT
TANNENHAUSER, MATTHEW McGEE,
GEORGE HARRIGAN, DOES 1-100,

     Defendants.

CIVIL ACTION NO.

1:05-CV-3147-JEC

## ORDER & OPINION

This case is presently before the Court on defendants' Motions to Dismiss [53] and [54].  The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' Motions to Dismiss [53] and [54] should be **GRANTED**.

## BACKGROUND

Relators James Brickman and Greenlight Capital assert claims against defendants Business Loan Express, LLC ("BLX") and Business Loan Center, LLC ("BLC") under the False Claims Act (the "FCA"), 31 U.S.C. § 3729 et seq. (Third Amended Compl. ("Compl.") [22].) That Act creates a cause of action against any individual who submits a false or fraudulent claim for payment to the United States government. See 31 U.S.C. § 3729(a). The action can be brought by the Attorney General or by private individuals on behalf of the government under the FCA's qui tam provision.[1]  31 U.S.C. § 3730(a) and(b).

Relators' claims involve allegedly fraudulent small business loans that were guaranteed by the Small Business Administration ("SBA"), pursuant to § 7(a) of the Small Business Act. (Compl. [22]

---

[1]  The qui tam provision encourages private individuals to file actions by allowing them to keep a percentage of any recovery. 31 U.S.C. § 3730(d). However, there is an additional financial motive behind this case. James Brickman and Greenlight Capital have been publicly identified as having a "short" position in the stock of Allied Capital, Inc., a publicly traded company that owns approximately 95% of defendant BLX. (Defs.' Mot. to Dismiss [54] at 4.)  A short seller borrows stock from a lender and sells the borrowed stock, hoping and expecting that the price of the stock will decline.  If the price declines, the short seller will be able to purchase the stock later at a lower price, return the stock to the lender, and keep the profits.  Brickman and Greenlight Capital thus stand to benefit from any decrease in the price of Allied stock that may result from this lawsuit.

AO 72A
(Rev.8/82)

at ¶¶ 14, 32.)   Section 7(a) authorizes the SBA to guarantee private loans to qualified small businesses.  (*Id.* at ¶ 12.)   By shifting the risk of default from the lender to the government, § 7(a) encourages private lenders to loan money to small businesses that otherwise would not be able to obtain loans.  (*Id.*)   To minimize the risk of default, a § 7(a) lender must certify that it has complied with the SBA's Standard Operating Procedures ("SOPs").   (*Id.* at ¶¶ 13-14.) These SOPs are designed to ensure, among other things, that the borrower is creditworthy and that the loan proceeds will be disbursed to the correct person and for the authorized purpose.  (*Id.* at ¶ 14.) The lender also must verify that the borrower has injected a specified amount of equity into the business that the SBA guaranteed loan is to fund.  (Compl. [22] at ¶ 14.)

Defendant BLC is a small business lender and a wholly owned subsidiary of defendant BLX.[2]   (*Id.* at ¶ 5.)   From January 1999 through December 2005, BLC made numerous loans to individuals for the purpose of purchasing and operating shrimp boats in the Gulf of Mexico.  (*Id.* at ¶ 32.)   BLC applied for and obtained SBA guarantees for these loans under § 7(a).   (*Id.*)   In securing guarantees, BLC

---

[2]   Defendant Robert Tannenhauser was at all relevant times BLX's Chief Executive Officer.  (Compl. [22] at ¶ 9.)   Defendant Matthew McGee was a Senior Vice President at BLX and a Managing Director at BLC.  (*Id.* at ¶ 7.)   Defendant George Harrigan was a loan broker and agent of BLC.  (*Id.* at ¶ 8.)

AO 72A
(Rev.8/82)

certified that it had complied with the SBA's SOPs concerning loan disbursement and borrower creditworthiness, and verified that each borrower had made the required equity injection. (*Id.*)

In 2001, the Gulf Coast shrimping industry suffered heavy losses as a result of falling prices from imported farmed shrimp and rising diesel fuel costs and insurance premiums. (Compl. [22] at ¶ 39.) Consequently, a substantial number of BLC's § 7(a) shrimp boat loans went into default. (*Id.* at ¶ 46.) Pursuant to § 7(a), BLC made a written demand to the SBA to purchase the guaranteed portion of the loans. (*Id.*) In doing so, BLC again certified that the loans had been closed, disbursed, and serviced in compliance with the SBA's SOPs, and that BLC had verified that each borrower met the equity injection requirement. (*Id.*)

Relators allege that BLC falsely certified its compliance with the SBA's SOPs and other requirements. (*Id.* at ¶ 32.) According to relators, BLC's false submissions succeeded in defrauding the United States government out of tens of millions of dollars spent to purchase guarantees on § 7(a) shrimp boat loans. (Compl. [22] at ¶ 45.) Relators seek damages and civil penalties on behalf of the United States.

Defendants have filed motions to dismiss pursuant to Rule 9(b) and Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Defs.'

4

Mots. to Dismiss [53] and [54].)   Defendants contend that the Court

lacks subject matter jurisdiction over relators' claims as a result

of the FCA's "public disclosure bar."   (*Id.* at 27-37.)   They argue,

further, that relators have not pled their FCA claim with sufficient

particularity to meet the requirements of Rule 9(b).   (*Id.* at 37-49.)

### DISCUSSION

**I.   Defendants' Rule 12(b)(1) Motion**

**A.   Standard for dismissal under Rule 12(b)(1)**[3]

"'Federal courts are courts of limited jurisdiction.'" *Federated*

*Mut. Ins. Co. v. McKinnon Motors, LLC,* 329 F.3d 805, 807 (11th Cir.

2003)(quoting *Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095 (11th Cir.

1994)).   A party invoking federal jurisdiction thus "bears the burden

of establishing its existence."   *Parker v. Scrap Metal Processors,*

*Inc.,* 386 F.3d 993, 1003 (11th Cir. 2004).   That party must allege

facts   sufficient   to   show   jurisdiction   and,   when   the   Court's

jurisdiction   is   appropriately   challenged,   support   those   facts   by

_____

[3]   Contrary to relators' argument, Rule 12(b)(1) is the proper
vehicle for challenging the Court's jurisdiction under the FCA's
public disclosure bar.   *See Rockwell Int'l Corp. V. United States,*
127 S.Ct. 1397 (Mar. 27, 2007).   The Supreme Court left no doubt
about this issue in *Rockwell,* describing the FCA's public disclosure
bar as a "jurisdiction-removing provision."   *Id.* at 1406.   In
addition, the Eleventh Circuit recently applied Rule 12(b)(1) to
decide a motion to dismiss under the FCA's public disclosure bar.
*United States v. ex rel McElmurray v. Consol. Gov't of Augusta-
Richmond County,* 501 F.3d 1244 (11th Cir. 2007).

AO 72A
(Rev.8/82)

competent evidence. *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936).

As suggested by *McNutt*, the Court may consider evidence outside of the pleadings to determine whether it has subject matter jurisdiction. *See Goodman v. Sipos,* 259 F.3d 1327, 1332 (11th Cir. 2001)(citing *Smith v. GTE Corp.,* 236 F.3d 1292, 1299 (11th Cir. 2001)). To that end, the Court has the power to grant a Rule 12(b)(1) motion on any of three separate bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the Court's resolution of disputed facts." *United States ex rel. McElmurray v. Consol. Gov't Of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). In a case involving disputed facts, however, it may be necessary to provide an opportunity for discovery and a hearing "that is appropriate to the nature of the motion to dismiss." *Id.*

In this case, the Court is able to decide the jurisdictional question without resolving any factual disputes. For purposes of this motion, the Court assumes all of the allegations in the complaint are true and construes all facts in favor of relators. Accordingly, discovery and a hearing are not necessary.

**B.    The FCA's jurisdictional bar**

FCA § 3730(e)(4) states that:

> No court shall have jurisdiction over [an FCA *qui tam*
> action] based upon the public disclosure of allegations
> or transactions in a criminal, civil, or administrative
> hearing,   in   a   congressional,   administrative,   or
> Government Accounting Office report, hearing, audit, or
> investigation, or from the news media, unless . . . the
> person bringing the action is an original source of the
> information.

31 U.S.C. § 3730(e)(4)(A).[4]  This provision precludes federal courts

from exercising jurisdiction over *qui tam* FCA claims that are based

on publicly disclosed information unless the relator is an "original

source" of the information.  *McElmurray*, 501 F.3d at 1251.

The Eleventh Circuit has condensed § 3730(e)(4) into a three-

part inquiry.  *Id.* at 1252.  *See also United States ex rel. Battle v.

Bd. of Regents for the State of Georgia*, 468 F.3d 755, 762 (11th Cir.

2006).  First,  the  Court  determines  whether  the  allegations  or

---

[4]    This  language  reflects  a  struggle  to  encourage  private
individuals to come forward with information about government fraud
while prohibiting "parasitic lawsuits" based on information that is
already in the public domain.  *United States ex rel. Williams v. NEC
Corp.*,  931  F.2d  1493,  1496-97  (11th  Cir.  1991).    As  originally
drafted, the FCA permitted a private relator to initiate suit even
though he contributed nothing to the exposure of the alleged fraud.
*Id.* at 1497.  As a result of a multiplicity of "parasitic lawsuits"
based entirely on public information, Congress amended the FCA in
1943 to bar *qui tam* suits based upon information that was already "in
the possession of the government."   *Id.*   It soon became apparent,
however, that the broad language of the 1943 amendment barred many
meritorious and non-parasitic actions.  *Id.*  Congress thus amended
the FCA in 1986 to include the language cited above.  *Id.* at 1497.

7

transactions asserted by the relator have been publicly disclosed. *Id.* If so, the Court asks whether the disclosed information is the basis of the relator's suit. *Id.* If yes, the suit is barred unless the relator is an "original source" of the information. *Id.*

### 1.   "Publicly disclosed"

Most if not all of the information in the complaint was publicly disclosed long before relators filed this action.   Addressing relators' allegations by category:

(1) <u>The equity injection requirement.</u>  Relators claim that BLC falsely certified that borrowers would inject a specified amount of equity into each shrimp boat purchased with the proceeds of an SBA-guaranteed loan.   (Compl. [22] at ¶ 44.)   In support of this claim, relators cite borrower Thomas Van Nguyen's sworn statement that he did not inject the required cash equity into the shrimp boat *Sea Commander IV*, which was purchased with proceeds from a § 7(a) loan. (*Id.* at ¶ 80.)

Mr. Nguyen made the above statement in a deposition that he provided in 2004 in connection with a bankruptcy proceeding in the Southern District of Texas.   (Defs.' Mot. to Dismiss [54] at Ex. 28.) The Eleventh Circuit recently clarified that information that was uncovered during discovery in a previous lawsuit constitutes a "public disclosure" under § 3730(e)(4)(A).   *McElmurray*, 501 F.3d at

8

1253. Under *McElmurray*, Mr. Nguyen's statement was thus "publicly disclosed" before relators filed this lawsuit.

(2) <u>Borrower creditworthiness</u>. Relators also contend that BLC falsely certified that each shrimp boat borrower was creditworthy. (Compl. [22] at ¶ 32.)  In support of this allegation, relators assert that, by 2001, it was "public knowledge that the shrimp boat market was in a state of collapse due to falling prices from imported shrimp grown on farms and escalating operating costs caused by rising fuel costs and insurance premiums." (*Id.* at ¶ 39.)  In addition, relators cite the following facts about various individual shrimp boat purchasers: (a) Matthew and Sharon Denton, who obtained a $480,000 loan to purchase the shrimp boats *Master Chase* and *Iron Eagle*, lacked fishing experience; (b) Khan Van Nguyen, who obtained a $660,000 SBA-guaranteed loan to purchase the shrimp boat *Sea Commander II*, lacked fishing experience; (c) Thomas Van Nguyen reported a taxable income of $703 in the year prior to obtaining his loan; and (d) Can Van Nguyen had a prior mortgage and lien on his shrimp boat *Sea Diamond II*, which he refinanced with an SBA-guaranteed loan. (*Id.* at ¶¶ 51, 64, 77, 95.)

The problems in the American shrimping industry were widely reported in the news media as early as 2003. (Defs.' Mot. to Dismiss [54] at Exs. 5-10.)  Several articles specifically discussed the

9

rising threat of shrimp boat loan defaults and repossessions.  (*Id.* at Exs. 5, 9.)   One 2003 article reported that profitability was so low that the United States Congress had appropriated $17.5 million in disaster aid for the Gulf Coast shrimping industry.  (*Id.* at Ex. 6.) As noted, relators themselves allege that the collapse of the industry was "public knowledge" by 2001.  (*Id.* at ¶ 39.)

The specific fact that Thomas Van Nguyen only reported $703 in taxable income the year prior to receiving his loan was publicly disclosed in his 2004 deposition testimony.  (*Id.* at Ex. 28, p. 17.) Information related to the Dentons was similarly disclosed in a foreclosure complaint filed by BLC in 2003 in the Northern District of Florida.  (Defs.' Mot. to Dismiss [54] at Ex. 27.)  As discussed, information acquired during discovery in a prior lawsuit is "publicly disclosed" for purposes of the FCA.  *McElmurray,* 501 F.3d at 1253. The same rule applies to information disclosed at other stages of civil proceedings.  *Id.*

As to the prior mortgage and lien on the Sea *Diamond II,* both appeared on a United States Coast Guard vessel abstract that was published prior to the date on which relators filed this action. (Defs.' Mot. to Dismiss [54] at Ex. 25.)   Vessel abstracts may be ordered from the Coast Guard website and are widely available to the general public.  (*Id.*)   They clearly constitute public disclosures

10

under the FCA.   *See McElmurray,* 501 F.3d at 1253 (holding that notifications and reports prepared by the Georgia EPD are publicly disclosed "administrative reports" under § 3730(e)(4).)

(3) <u>Disbursement of loan proceeds</u>.  Relators claim, further, that BLC misrepresented the recipient of the proceeds of numerous shrimp boat loans.  (Compl. [22] at ¶ 105.)   In support of this allegation, relators cite records showing that BLC made numerous SBA-guaranteed shrimp boat loans to different borrowers who all listed their address as 358 Pine Street in Biloxi, Mississippi.   (*Id.*) Apparently this was the address of an insurance and leasing company known as "Viet's Fleet."   (*Id.*)   However, BLC used this address for more than 44 SBA-guaranteed loans to various individual borrowers. (*Id.* at ¶ 112.)

Relators obtained most of the information concerning the Pine Street address directly from the SBA pursuant to FOIA requests. (Defs.' Mot. to Dismiss [54] at Ex. 16.)   In response to one request, the SBA provided relators a spreadsheet listing the approval dates, loan amounts, the date and amount of any guarantee repurchase, and the current status of more than 150 BLC-issued shrimp boat loans. (*Id.* at Ex. 17.)   Most of the loans on the spreadsheet can be matched to individual borrowers from information in a public report prepared by the SBA and made available on its website. (*Id.* at Ex. 21.)   A

11

separate public website discloses that many of BLC's shrimp boat loans were issued to borrowers who used the 358 Pine Street address as their mailing address. (*Id.* at Ex. 20.)  All of these records are widely available to the general public, and thus constitute public disclosures. *See United States ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.,* 384 F.3d 168, 176 (5th Cir. 2004)("the response to [relator's] FOIA request is an administrative report constituting a public disclosure under § 3730(e)(4)") and *United States ex rel. Mistick PBT v. Hous. Auth. of Pittsburgh,* 186 F.3d 376, 383 (3d Cir. 1999)(holding same).

To provide a specific example of defendants' alleged fraud with respect to the 358 Pine Street address, relators cite an SBA-guaranteed loan made on behalf of Asian Gulfstream Corporation to purchase the shrimp boat *Gulf Stream II.* (Compl. [22] at ¶ 106.) According to relators, the true recipient of the loan proceeds was Xuong Nguyen, who already owned *Gulf Stream II.* (*Id.* at ¶ 108.) The 358 Pine Street address was listed on Asian Gulfstream's loan application. (*Id.*)  However, Xuong Nguyen actually lived in Houston, Texas at the time the loan was made. (*Id.*)

Relators acquired this information by reviewing a foreclosure complaint that BLC filed against Asian Gulfstream Corporation in 2004 in the Southern District of Alabama. (Defs.' Mot. to Dismiss [54] at

12

Ex. 26.)   The SBA Note attached to the complaint is signed by Xuong

Nguyen as President of Asian Gulfstream Corporation.   (*Id.*)   It lists

the address of Asian Gulfstream Corporation as 358 Pine Street,

Biloxi, MS.   (*Id.*)   Asian Gulfstream's relationship with Xuong

Nguyen, as well its use of the 358 Pine Street address, was thus

publicly disclosed prior to the time relators filed this action.

*McElmurray,* 501 F.3d at 1253.

4)  Additional loan origination violations.   Finally, relators

allege that BLC failed to comply with an SBA SOP placing a $1 million

cap on SBA-guaranteed loans made to an individual borrower and any

affiliated entities.   (Compl. [22] at ¶ 14.)   Specifically, relators

claim that BLC violated the cap in originating Thomas Van Nguyen's

$800,000 loan for the purchase of *Sea Commander IV* and Den Van

Nguyen's $960,000 loan for the purchase of *Sea Commander V.*   (*Id.* at

¶ 92.)   Thomas Van Nguyen had previously obtained a $625,000 SBA-

guaranteed loan to purchase *Sea Commander I*, the full amount of which

was outstanding when he obtained the $800,000 loan for *Sea Commander*

*IV.*   (*Id.* at ¶ 82.)   Both of those loans were outstanding when BLC

issued the $960,000 loan to Thomas Van Nguyen's father and affiliate,

Den Van Nguyen, to purchase *Sea Commander V.*[5]   (*Id.* at ¶ 92.)

---

[5]  Relators claim that BLC violated another SOP by making a loan
to Can Van Nguyen to refinance his private mortgage on the *Sea
Diamond II* and to satisfy a lien on the vessel.   (Compl. [22] at ¶
100.)   As discussed, the mortgage and lien on the *Sea Diamond II* was

AO 72A
(Rev.8/82)

Thomas Van Nguyen testified in his 2004 bankruptcy deposition that he obtained an $800,000 loan to purchase *Sea Commander IV.* (Defs.' Mot. to Dismiss [54] at Ex. 28.)  Mr. Nguyen also testified that, at the time he obtained the loan to purchase *Sea Commander IV,* he had an outstanding loan of $625,000 that he had obtained to purchase *Sea Commander I.* (*Id.*)  In addition, it was apparent from his testimony that Thomas Van Nguyen and Den Van Nguyen are related and affiliated.  (*Id.*)  Mr. Nguyen testified that he lived with his parents and shared business interests with his father, Den.  (*Id.*)  Again, information acquired during discovery in a prior lawsuit constitutes a "public disclosure" under the Eleventh Circuit's interpretation of the FCA.  *McElmurray,* 501 F.3d at 1253.

### 2.    "Allegations or transactions"

Relators do not dispute any of the above disclosures.  (*See generally* Relators' Response to Defs.' Mot. to Dismiss ("Response") [60].)  Relators thus apparently concede that most of the factual information in their complaint was available to any member of the public who cared to search for it.  (*Id.*)  However, relators contend that publicly disclosed "information" does not necessarily constitute publicly disclosed "allegations or transactions."  (*Id.* at 4.)

_____

indicated on public records maintained by the United States Coast Guard.

14

According to relators, neither the allegations nor the transactions asserted in their complaint were publicly disclosed prior to the date on which they filed this action.  (*Id.*)   Consequently, relators argue, the FCA's public disclosure bar does not apply.  (*Id.*)

In asserting a distinction between "information" and "allegations or transactions" relators rely on *United States ex rel. Springfield Terminal Ry. Co. V. Quinn,* 14 F.3d 645 (D.C. Cir. 1994). The relator in *Springfield* filed a *qui tam* suit against an arbitrator appointed by the National Mediation Board to resolve a labor dispute between the relator and its union.  *Id.* at 648.  The relator had obtained the arbitrator's pay vouchers and telephone records through discovery in a prior related lawsuit.  *Id.*  Upon reviewing the pay vouchers and telephone records the relator determined, based on its personal involvement in the arbitration, that the arbitrator had requested payment for several days on which he had performed no arbitral services.  *Id.*

The district court dismissed the action under the FCA's public disclosure bar, but the D.C. Circuit reversed.  *Id.* at 647, 653.  The Circuit Court acknowledged that the relator's suit relied on information--the arbitrator's pay vouchers and telephone records-- that had been publicly disclosed in prior litigation.  *Springfield,* 14 F.3d at 652.  However, the Court held that the FCA required the

15

public disclosure not only of information, but of an "allegation" of fraud or a fraudulent "transaction." *Id.* at 653. Illustrating the "allegation or transaction" requirement with a mathematical formula that has been repeated by several courts, the *Springfield* Court explained that:

> the term "allegation" connotes a conclusory statement implying the existence of provable supporting facts. The term "transaction" suggests an exchange between two parties or things that reciprocally affect or influence one another. On the basis of plain meaning, and at the risk of belabored illustration, if X+Y=Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed.

*Id.* at 653-654 (internal citations omitted).

Applying the above formula, the Court found that the "allegation or transaction" requirement had not been met because neither the allegation of fraud (Z) nor the essential elements of a fraudulent transaction (X and Y) had been publicly disclosed. *Id.* at 655. With regard to the transaction component of the formula, the Court explained that a fraudulent transaction requires both a misrepresented set of facts (X) and a true set of facts (Y). *Id.* The arbitrator's pay vouchers and telephone records only disclosed the misrepresented facts (X). *Springfield,* 14 F.3d at 655. The relator's inside information about the true facts (Y), which was

16

essential to demonstrate a fraudulent transaction, had not been publicly disclosed. *Id.*

Relators' reliance on *Springfield* is misplaced. As an initial matter, the Eleventh Circuit appears to more broadly interpret the term "public disclosure" than does the D.C. Circuit in *Springfield*. The Eleventh Circuit states that *qui tam* suits based on publicly disclosed *information* are barred unless the relator is an "original source" of the information. *McElmurray*, 501 F.3d at 1253; *Battle*, 468 F.3d at 762. *See also United States ex rel. Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 565 (11th Cir. 1994) ("A court reaches the original source question only if it finds the plaintiff's suit is based on *information* publicly disclosed.") (emphasis added).

In addition, the public disclosures in this case are sufficient to trigger the FCA's jurisdictional bar even under the *Springfield* analysis. According to relators, defendants submitted false certifications misrepresenting that they had complied with the SBA's SOPs and other regulations. (Compl. [22] at ¶ 32.) Section 7(a)'s certification requirement was disclosed in the regulations that govern the program. *See* 13 C.F.R. § 120.150 (describing the SBA's lending criteria). SBA regulations are public and constitute "administrative reports." *See McElmurray,* 501 F.3d at 1253.

AO 72A
(Rev.8/82)

Defendant's specific certifications were disclosed in civil litigation records and in records maintained by the SBA and produced in response to relators' FOIA requests. (*See* Defs.' Mot. to Dismiss [54] at Ex. 27.) The misrepresented fact (X) that BLC had complied with various SBA requirements and regulations in making loans under § 7(a) was thus public knowledge.

The true facts (Y) were also publicly disclosed, as described in detail above. To recap briefly, Thomas Van Nguyen testified in his deposition that he did not meet the equity injection requirement when he obtained the $800,000 loan to purchase *Sea Commander IV.* (*Id.* at Ex. 28.) Problems in the shrimping industry were widely reported in the news media, and relators themselves allege that by 2001 it was public knowledge that the industry was in a "state of collapse." (*Id.* at Exs. 5-10; Compl. [22] at ¶ 39.) Information casting doubt on the creditworthiness of individual borrowers Thomas Van Nguyen and the Dentons was disclosed in Mr. Nguyen's deposition testimony and in a foreclosure action instituted by BLC in 2003 in the Northern District of Florida. (Defs.' Mot. to Dismiss [54] at Exs. 27 and 28.) In addition, a prior mortgage and lien on the Sea *Diamond II* appeared on a vessel abstract maintained by the United States Coast Guard. (*Id.* at Ex. 25.) Finally, the fact that BLC made loans to at least 44 different borrowers who used the same address was also available from public records. (*Id.* at Ex. 20.)

18

### 3.   "Based Upon"

Neither is there any doubt that the complaint is "based upon" the publicly disclosed information described above.  The Eleventh Circuit has broadly defined "based upon" to mean "supported by." *Cooper,* 19 F.3d at 567 (describing the "based upon" test as a "quick trigger to get to the more exacting original source inquiry.").  See *also Battle*, 468 F.3d at 762 (stating that the FCA bars suits "based *in any part* on publicly disclosed information")(emphasis in original).  Relators' allegations are unquestionably "supported by" Thomas Van Nguyen's deposition testimony, as well as the media reports concerning the shrimping industry and the other public records discussed above.[6]

### 4.   "Original source"

Finally, relators do not, and cannot, argue that they are an "original source" of the information in their complaint.  (*See*

---

[6]   Relators suggest that their experience in the field enabled them to comprehend the publicly available documents.  (See Response [60] at 6.)  On this point, the Court agrees with *Springfield*:

> [T]here may be situations in which all of the critical elements of fraud have been publicly disclosed, but in a form not accessible to most people, *i.e.*, engineering blueprints on file with a public agency.  Expertise in the field of engineering would not in itself give a *qui tam* plaintiff the basis for suit when all the material elements of fraud are publicly available, though not readily comprehensible to non-experts.

*Springfield*, 14 F.3d at 655.

19

Response [60] at 7, n.3.)  The FCA defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based."  31 U.S.C. § 3730(e)(4)(B).  Relators concede that they were not personally involved in the transactions at issue.  Relators claim that they reviewed nonpublic internal corporate documents and interviewed BLC and BLX employees as part of their investigation into defendants' fraud.  (Response [60] at 6.)  However, relators do not identify any facts that they obtained from their review of nonpublic materials, aside from a former employee's comment generally describing shrimp boat loans as a "scam."  (Compl. [22] at ¶ 34.)

As the Eleventh Circuit interprets the FCA, a relator who files a *qui tam* action that is based "*in any part* on publicly disclosed information . . . must demonstrate that [he] is an original source of that information."  *McElmurray,* 501 F.3d at 1253 (emphasis in original).  Relators in this case have not met that burden. Accordingly, the Court lacks subject matter jurisdiction over relators' claims pursuant to FCA § 3730(e)(4). The Court thus **GRANTS** defendants' Rule 12(b)(1) motion to dismiss.

## II.  Defendants' Rule 9(b) Motion

The Court has determined that it lacks subject matter jurisdiction over this case.  Accordingly, it is not necessary to

20

consider defendants' motion to dismiss for failure to comply with Rule 9(b).

## **CONCLUSION**

For the foregoing reasons, the Court finds that defendants' Rule 12(b)(1) Motions to Dismiss [53] and [54] should be **GRANTED**.

SO ORDERED, this _18_ day of December, 2007.

_____
JULIE E. CANES
UNITED STATES DISTRICT JUDGE